IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In the Matter of THE COMPLAINT OF | * | |
| UNDER THE BRIDGE | | |
| WATERSPORTS, LLC, as Owner of | * | |
| the 2001 Godfrey Marine Company 22' | | Civil Action No. GLR-20-1111 |
| 0" pontoon vessel Seeking Exoneration | * | |
| from or Limitation of Liability. | | |

*** 

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Complainant Under the Bridge Watersports,

LLC's ("UTB") Motion for Summary Judgment (ECF No. 66) and Claimants Michael

Dorris and Christina Dorris, individually and as Parents and Next Friends of Nathaniel

Dorris and Milena Dorris; Jennifer Tressler, individually and as Parent and Next Friend of

Connor Tressler; and Logan Tressler, Luke Tressler, and Damon Schorr's (collectively,

"Claimants") Cross Motion for Summary Judgment (ECF No. 67). The Motions are ripe

for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2021). For the

reasons set forth below, the Court will grant UTB's Motion for Summary Judgment and

deny Claimants' Cross Motion for Summary Judgment.

## I.    BACKGROUND

### A.    <u>Factual Background</u>

On August 1, 2019, Claimants rented a 2001 Godfrey Marine Company 22' 0"

pontoon vessel (the "Vessel") from UTB, which was owned by UTB during all times

relevant to this dispute. (Compl. Seeking Exoneration or Limitation Liability ["Compl."]

¶¶ 2, 4, ECF No. 1). Claimants rented the Vessel for the purpose of "pleasure cruising and

tubing." (Claimants' Mem. Pts. Auth. Supp. Cross Mot. Summ. J. & Opp'n Mot. Summ. J.

["Claimants' Cross Mot."] at 16, ECF No. 67-1).

Prior to boarding the Vessel, UTB provided Claimants with a "Participant

Agreement, Release and Assumption of Risk" contract (the "Agreement"), among other

paperwork.  (UTB Mot. Ex. B ["Agmt."], ECF No. 66-4). Claimants Michael Dorris, Jr.,

Christina Dorris, and Jennifer Tressler (the "Adult Claimants") each signed the Agreement,

which states, in pertinent part:

> I hereby agree to release, indemnify, and discharge [UTB], on
> behalf of myself, my spouse, my children, my parents, my
> heirs, assigns, personal representative and estate . . . I
> acknowledge that my participation . . . entails known and
> unanticipated risks . . . . I expressly agree and promise to accept
> and assume all of risks existing in this activity . . . I hereby
> voluntarily release, forever discharge, and agree to indemnify
> and hold harmless [UTB] from any and all claims, demands, or
> causes of action, which are in any way connected with my
> participation in this activity or my use of [UTB's] equipment
> or facilities, **including any such claims which allege**
> **negligent acts or omissions of [UTB]**. . . . Should [UTB], or
> anyone acting on their behalf, be required to incur attorneys
> fees and costs to enforce this agreement, I agree to indemnify
> and hold them harmless for all such fees and costs. . . . **By**
> **signing this document, I acknowledge that if anyone is hurt**
> **or property is damaged during my participation in this**
> **activity, I may be found by a court of law to have waived**
> **my right to maintain a lawsuit against [UTB] on the basis**
> **of any claim from which I have released them herein**. . . . **I**
> **have had sufficient opportunity to read this entire**
> **document. I have read and understood it, and I agree to be**
> **bound by its terms.**

(Agmt. (emphasis in original)). The Adult Claimants also signed a portion of the

Agreement entitled "Parent's or Guardian's Additional Indemnification" on behalf of the

minors they accompanied on the Vessel. (Id.). Michael Dorris, the "designated operator,"

2

signed an additional agreement, which stated: "This person is LEGALLY responsible for the safe & legal operation of the vessel." (Release & Waiver at 2, ECF No. 66-6 (emphasis in original)).

The capacity plate affixed to the Vessel stated that it could carry up to sixteen persons or 2,270 lbs. (Cameron Michael Riley Tr. ["Riley Dep."] at 55:20–56:09, ECF No. 67-4). UTB employees selected the Vessel for Claimants based on the number of individuals in their group (fifteen) and did not consider the totality of their weight in making this decision. (Id. at 50:08–51:18). When Claimants boarded the Vessel, they felt "pretty tight," prompting Christina Dorris to seek assurance from UTB's dockhand that the Vessel was appropriate for the group, which he assured her it was. (Christina Dorris Tr. ["Christina Dorris Dep."] at 61:06–15, ECF No. 67-5). Before leaving UTB's dock, the dockhand provided Claimants with instructions concerning navigation and safety. (Id. at 61:16–21). Specifically, he instructed Claimants that if they became lodged on a sandbar, they should "turn the engine off, lift the propeller, get out, push off the sandbar, and get back in." (Id.). The act of raising or lowering the propeller of the motor is known as "trimming." (Transcript of Stephen B. Mason, AMS ["Mason Dep."] at 31:09–12, ECF No. 66-14).

Michael Dorris then sailed the Vessel then into the Chesapeake Bay with fourteen passengers, including the remaining Claimants. (Compl. ¶ 4). Claimants had no issue with the trim mechanism when the Vessel left the dock, (Christina Dorris Dep. at 72:01–06), but state that the Vessel became "so submerged" such that "both pontoons were actually submerged in the water.." (Id. at 81:10–15).

3

During their voyage, Claimants anchored the Vessel for lunch and trimmed the propeller into the upright position. (Id. at 78:21–80:03). Before starting the engine again, they lowered it back into the water. (Id. at 80:04–08). At some point thereafter, the Vessel became unintentionally lodged on a sandbar. (Id. at 80:12–16). Claimants state that they followed the dockhand's instructions but were unable to trim the propeller back into the water once the Vessel was freed from the sandbar and therefore had no ability to power or navigate the Vessel. (Id. at 82:04–84:12).[1] The Vessel subsequently became caught in a strong current, was "pushed . . . right into the bridge," and capsized (the "Incident"). (Id. at 84:16–22). All fifteen passengers went overboard. (Id. at 87:02–03). Claimants describe the aftermath, including water entrapment, inability to find loved ones, chaos, [and] fear of imminent death and near drownings. (Id. at 86:04–87:03; Michael J. Dorris, Jr. Tr. ["Michael Dorris Dep."] at 55:15–59:07). The United States Coast Guard (the "Coast

---

[1] UTB disputes that the trim mechanism failed and presents its arguments as relying on the "assumption" that the mechanical failure occurred as Claimants allege.  (See UTB Mot. at 17; UTB Reply at 6–7). This dispute is based in part on a Coast Guard report presented by Claimants as an exhibit to the Cross Motion. (See Claimants' Mot. Ex. 7 ["Coast Guard Report"], ECF No. 67-9). UTB noted in its Reply that Claimants did not provide this material in discovery and first requested the report on February 4, 2022, despite discovery closing on December 30, 2021. (UTB Reply at 7 n.1). Claimants obtained the report on June 10, 2022, (see Coast Guard Report at 2), over five months after the close of discovery. (See Scheduling Order at 2, ECF 22). Thus, the Coast Guard Report is not properly before the Court and the Court does not consider this evidence in its analysis of the parties' claims herein.

The Court does find it notable, though, that the Coast Guard Report stated that the trim mechanism was found in the down position after the Incident and that a subsequent investigation revealed it to be fully functional. (See Coast Guard Report at 5). Because it was not properly produced in evidence, the Court proceeds on the assumption that Claimants truthfully reported the failure of the trim mechanism. But, the Court notes its disappointment that the parties did not properly submit this evidence, as it is especially pertinent to this case.

4

Guard") responded to the Incident and ensured that all of the Vessel's passengers had been retrieved from the water. (Michael Dorris Dep. at 59:12–60:15).

In the Complaint, UTB alleges that Incident occurred because Michael Dorris operated the Vessel "at an excessive rate of speed and fail[ed] to keep a safe lookout." (Compl. ¶ 5). In opposition, Claimants assert that the Vessel became stuck on the sandbar because it was overweight at the time of the Incident. (Verified Claims Resp'ts ["Claims"] ¶¶ 4–8, ECF No. 11).

**B.    <u>Expert Evidence</u>**

Claimants hired Stephen B. Mason to provide expert testimony in support of their claim for damages. (<u>See generally</u> Mason Report at 4, ECF No. 67-8). Mason handles insurance claims and performs risk inspections for major watercraft insurance carriers. (<u>Id.</u> at 1–2). Mason's company prepared an expert report for this matter after reviewing "the pleadings, witnesses, police reports (DNR), photos of the vessel, the passenger list, vessel ownership record, [] research pertaining to the vessel[']s data, and its limitations as per the U.S. Coast Guard." (<u>Id.</u> at 4). Mason did not examine the wreckage of the Vessel, nor did he speak with Coast Guard or Maryland Department of Natural Resources ("DNR") personnel. (Mason Dep. at 37:03–16) (stating that, prior to the deposition, he spoke only to counsel for Claimants about the Incident).

In his expert report, Mason states that "it is obvious from the police report that the vessel was overloaded for routine or normal use" and that "based on the photographs of the passengers and vessel, we feel that the vessel was grossly overweight and poorly loaded." (Mason Report at 5). In addition, Mason's report concludes: "There is no room

5

for error and the overloading of the vessel coupled with mechanical problems and failures lead directly to the accident." (Id.). He also notes that "when the vessel[']s engine failed it collided with the bridge structure, this then caused the overloaded vessel to list, overturn, and sink." (Id.).

Mason expanded on this report in his December 7, 2021 deposition testimony. (See generally Mason Dep.). Despite the statement in his report that the accident was caused by the Vessel's overweight condition "coupled with" the trim failure, Mason testified that the failure of the trim mechanism would have left the Vessel just as much at the mercy of the current with only one passenger as it was with fifteen passengers aboard. (Id. at 40:16–41:01). Mason also confirmed that a vessel can experience a mechanical failure during a voyage for various reasons, (id. at 38:19–39:04), and that because the trim mechanism is "an electrically driven hydraulic pump," it could have failed as a result of battery issues, connection issues, or a lack of hydraulic fluid, (id. at 41:02–10). However, he did not provide an opinion as to why the trim mechanism failed in this particular instance. (Id. at 41:11–16).

## C.   **Procedural History**

UTB filed this limitation action on April 30, 2020, seeking to limit its liability or exoneration following the Incident. (See generally Compl.). On May 13, 2020, Claimants filed their Answer, (ECF No. 6), and on November 16, 2020, Claimants filed their Verified Claims, seeking compensation for the physical and emotional injuries they sustained from the Incident, (see generally Claims).

6

On December 7, 2020, UTB filed its Answer to the Verified Claims and a Counterclaim against Dorris and Tressler. (ECF No. 12). Dorris and Tressler filed an Answer to the Counterclaim on December 28, 2020. (ECF No. 13).

On May 25, 2022, UTB filed its Motion for Summary Judgment. (ECF No. 66). Claimants filed a Cross Motion for Summary Judgment and an Opposition to UTB's Motion for Summary Judgment on June 15, 2022. (ECF No. 67). UTB filed a Reply in support of its Motion and an Opposition to Claimants' Cross Motion on June 29, 2022. (ECF No. 68). Finally, Claimants filed a Reply in support of their Motion on July 13, 2022. (ECF No. 69).[2]

## II.   DISCUSSION

### A.   <u>**Standard of Review**</u>

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

---

[2] On July 15, 2022, counsel for UTB filed correspondence with the Court, stating that Claimants' Reply contained unauthorized surreply material. (ECF No. 70). On August 3, 2022, counsel for Claimants responded and conceded that the Reply included certain unauthorized surreply material. (ECF No. 72). The Court thereafter issued a letter Order striking the concededly unauthorized material but explained that references to a "meeting of the minds" in Claimants' Reply would be considered. (ECF No. 73).

stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof,

"there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

Where the parties have filed cross-motions for summary judgment, the Court is required to consider each motion "separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). The Court must deny both motions if there is a genuine issue of material fact. Horton v. Life Ins. Co. of N. Am., No. ELH-14-3, 2015 WL 1469196, at *34–35 (D.Md. Mar. 30, 2015). But if there is no genuine issue and one party is entitled to judgment as a matter of law, the Court will render judgment. Id. at 36 (citation omitted).

## B.   **Analysis**

This case arises out of a boating accident on the Isle of Wight Bay (Compl. ¶ 4) and is therefore within federal admiralty jurisdiction. See Vollmar v. O.C. Seacrets, Inc., 831 F.Supp.2d 862, 865 (D.Md. 2011) (noting that the Isle of Wight Bay is "a Maryland coastal bay within the navigable waters of the United States"); Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 539–40 (1995) (holding that navigation of boats in navigable waters is "closely related to activity traditionally subject to admiralty law"). The claims in this case are thus governed by admiralty law, but "admiralty law, at times, looks to state law, either statutory or decisional, to supply the rule of decision where there is no admiralty rule on point." Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir. 1981).

### 1.     Limitation of Liability

A shipowner may seek limitation of its liability for certain maritime claims under the Shipowner's Limitation of Liability Act, 46 U.S.C. § 30501 et seq. (the "Limitation Act"). Under the Limitation Act, a vessel owner may petition a federal court to limit its liability for damages or injuries that occur without the vessel owner's privity or knowledge to the value of the vessel or the owner's interest in the vessel. See 46 U.S.C. § 30505(a)–(b). Thus, the Court engages in a two-step inquiry in a limitation proceeding. First, the Court must "consider what acts of negligence or conditions of unseaworthiness caused the accident." Empresa Lineas Maritimas Argentinas S.A. v. United States, 730 F.2d 153, 155 (4th Cir. 1984). Second, if the Court finds that acts of negligence or unseaworthiness caused the accident, the Court must determine whether the shipowner had "privity or knowledge of the condition or negligence responsible for the collision." Hellenic Lines, Ltd. v. Prudential Lines, Inc., 730 F.2d 159, 166 (4th Cir. 1984). The claimants bear the initial burden of establishing liability, after which the burden shifts to the vessel owner to prove lack of privity or knowledge.  See In re Ass'n of Md. Pilots, 596 F.Supp.2d 915, 918 (D.Md. 2009).

In order to establish a claim of negligence under maritime law, a claimant must show each of the following elements by a preponderance of evidence: duty, breach, causation, and damages. Dann Marine Towing, LC v. Gen. Ship Repair Corp., No. MJG-12-1610, 2017 WL 3916992, at *13 (D.Md. Sept. 7, 2017). The owner of a vessel has an absolute duty to furnish a seaworthy ship, but this is "not to suggest that the owner is obligated to furnish an accident-free ship." See Mitchell v. Trawler Racer, Inc., 362 U.S.

539, 550 (1960). A seaworthy ship is one that is reasonably suited for its intended use. Id. Where, as here, the issue concerns a malfunction of complex machinery, expert testimony is required to establish negligence and causation. Selective Ins. Co. v. Empire Comfort Sys., No. WMN-03-0178, 2007 WL 7681251, at *4 (D.Md. Mar. 21, 2007); see also Moser v. Agway Petroleum Corp., 866 F.Supp. 262, 264 (D.Md. 1994) (noting that expert testimony was required regarding the operation of a heater involving mechanical parts and electrical circuits).

Claimants allege two conditions of unseaworthiness in this matter: (1) the trim mechanism failed; and (2) the Vessel was overweight. (See generally Claimants' Mot.). As an initial matter, Claimants cannot successfully argue that UTB is liable for negligence based on the trim mechanism failure because Mason, Claimants' expert, testified that the trim mechanism could have malfunctioned without any negligence on the part of UTB. (Mason Dep. 38:19–39:04, 41:02–16). There is therefore no evidence directly supporting UTB negligence related to the failure, and, without expert evidence, no support for imputing liability on UTB. Thus, UTB is entitled to judgment as a matter of law on this theory of liability.

The significant dispute amongst the parties, however, concerns the role the overweight condition played in causing the Incident. UTB contends that the trim mechanism failure alone caused the Incident, (see UTB Mot. at 18), and Claimants argue that the Incident is also attributable to the overweight condition of the Vessel (see Claimants' Mot. at 15–16).

"Under the general maritime law, a party's negligence is actionable only if it is the

11

'legal cause' of the plaintiff's injuries, which is something more than 'but for' causation [—] the negligence must be a substantial factor in causing the injuries." Dann Marine Towing, 2017 WL 3916992, at *14 (quoting In re Great Lakes Dredge & Dock Co. LLC, 624 F.3d 201, 213–14 (5th Cir. 2010)) (alteration in original) (citation omitted). But where the alleged negligence may have been brought about by "a later cause of independent origin that was not foreseeable," the doctrine of superseding cause applies. Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 837 (1996) (holding that the doctrine of superseding cause is properly applied in admiralty law). In other words, a court sitting in admiralty must make a finding of "proximate causation" in order to hold a party liable for negligence. Id. at 842 ("A party whose fault did not proximately cause the injury is not liable at all."); see also Pittway Corp. v. Collins, 973 A.2d 771, 786 (Md. 2009) ("It is a basic principle that '[n]egligence is not actionable unless it is a proximate cause of the harm alleged.'" (quoting Stone v. Chi. Title Ins., 624 A.2d 496, 500 (Md. 1993))). When making a finding of causation, "courts sitting in admiralty may draw guidance from . . . the extensive body of state law applying proximate causation requirements." Sofec, Inc., 517 U.S. at 839. Under Maryland law, conduct is found to be the proximate cause of injury when it is "1) a cause in fact, and 2) a legally cognizable cause." Pittway Corp., 973 A.2d at 786. The causation-in-fact inquiry seeks to determine whether the conduct at issue actually produced the injury. Id.

Claimants rely on one sentence in Mason's report to support their assertion of causation: "[T]he overloading of the vessel coupled with mechanical problems and failures lead directly to the accident." (Mason Report at 5). In doing so, Claimants urge the Court

to focus on the phrase "coupled with" to find that they met their burden to show causation. (See Claimants' Reply at 2). But this is belied by Mason's deposition testimony.[3] Mason confirmed that if the trim mechanism failed while only one person was aboard the Vessel, rather than the fifteen during the Incident, it would have been just as much at the mercy of the current. (Mason Dep. 40:16–41:01). In fact, Mason's report itself contradicts Claimants' assertion, stating that "[w]hen the vessel[']s engine failed, it collided with the bridge structure" and this "caused the overloaded vessel" to capsize.[4] (Mason Report at 5). Thus, the cause in fact of the Incident was the trim mechanism failure, not the overweight condition of the Vessel. Even if the Court was presented with sufficient evidence on which to conclude that the overloading of the Vessel contributed to the Incident, the trim mechanism failure was "a later cause of independent origin that was not foreseeable," which invokes the doctrine of superseding cause and leads to the same conclusion. Sofec, Inc., 517 U.S. at 837.

Though the dispute surrounding the cause of the Incident is a dispute of fact, it is

---

[3] Claimants again need expert evidence to demonstrate causation with regard to the overweight condition of the Vessel. Though it is not an issue of complex machinery, the risks associated with improper weighting and loading of a vessel are not within the common knowledge of a lay person. See, e.g., Judy v. Mako Marine Int'l, Inc., 422 F.Supp.3d 1062, 1066–67 (D.S.C. 2019) (analyzing plaintiffs' expert testimony to determine the cause of a capsize); Cargill, Inc. v. C & P Towing Co. Inc., 943 F.2d 48 (Table), at *4 (4th Cir. Sept. 17, 1991) (upholding a finding of causation for a ship accident that was based on expert testimony).

[4] Even if expert testimony was not required to demonstrate negligence, Claimants can point to no evidence to contradict Mason's testimony. (See, e.g., Maryland Natural Resources Police Incident Report, Claimants' Mot. Ex. 5 ["DNR Report"] at 5, 15, 18, ECF No. 67-7 (listing the trim mechanism failure as the cause of the Incident and making no mention of the overweight condition as a contributing factor)).

not a "material" fact and therefore does not prevent the Court from granting UTB's Motion

for Summary Judgment. This is because, "to create a dispositive issue of material fact, the

testimony of a defect and causation must be at least a 'probability' rather than a 'mere

possibility.'" Judy, 422 F.Supp.3d at 1067 (citing Hoban v. Grumman Corp., 907 F.2d

1138, at *2 (4th Cir. 1990)); see also Anderson, 477 U.S. at 248 (stating that a "material

fact" is one that might affect the outcome of a party's case). Thus, negligence claims

"cannot be based solely on conjecture and speculation as to the abstract possibility that an

alleged defect caused [the accident]." Hoban, 907 F.2d at *2 (internal quotations and

citations omitted). "A mere possibility of such causation is not enough; and when the matter

remains one of pure speculation or conjecture, or the probabilities are at best evenly

balanced, it becomes the duty of the court to direct a verdict for the [party opposing

liability]." Fitzgerald v. Manning, 679 F.2d 341, 348 (4th Cir. 1982). Claimants cannot

demonstrate that the overweight condition was the proximate cause of the Incident, and a

"complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322–23 (quoting

Anderson, 477 U.S. at 247).[5]

Accordingly, the Court grants UTB's Motion and denies Claimants' Cross Motion

on this ground.

---

[5] The Court is sympathetic to Claimants' experience and does not intend to discount
the trauma that the Incident may have caused them. However, the Court cannot proceed on
emotion and is bound by the law.

### 2.    Contract Enforcement

UTB also argues that it is entitled to summary judgment because Claimants' action is barred by the exculpatory clause in the Agreement and, further, that it is entitled to indemnity by the Adult Claimants for the costs incurred as a result of this litigation based on the indemnification clause. (See UTB Mot. at 19–22). In opposition, Claimants contend that the exculpatory clause is unenforceable because UTB engaged in gross negligence when it overloaded the Vessel, and that the Agreement should be set aside in its totality because there was no "meeting of the minds." (See Claimants' Mot. at 17; Claimants' Reply at 3). The Court agrees with UTB that both the exculpatory and indemnity clauses are valid and enforceable against Claimants.

"The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961). As a general rule, admiralty law applies to all maritime contracts, New England Mutual Insurance Co. v. Dunham, 78 U.S. (11 Wall.) 1, 29 (1871), which include contracts for the use of recreational vessels, see Waggoner v. Nags Head Water Sports, Inc., 141 F.3d 1162, at *1 (4th Cir. 1998). But as discussed above, the Court turns to state law when maritime law is silent on a particular issue. See Dann Marine Towing, 2017 WL 3916992, at *9.

The Court will look to Maryland state law to supplement the rules of maritime law. Pursuant to federal choice of law rules, courts determine which state's law to apply by "ascertaining and valuing points of contact between the transaction [giving rise to the cause of action] and the states or governments whose competing laws are involved." United

States v. Tug Marine Venture, 101 F.Supp.2d 378, 382 (D.Md. 2000) (quoting Am. Home

Assur. Co. v. L & L Marine Serv., Inc., 153 F.3d 616, 618 (8th Cir. 1998); Lauritzen v.

Larsen, 345 U.S. 571, 582 (1953)). In this matter, it is undisputed that Maryland state law

governs the transaction, because: UTB is organized under the laws of the state of Maryland,

(Compl. ¶ 1); the Vessel sailed from the coast of Maryland, (id. ¶ 4); the Maryland DNR

responded to the Incident, (see generally DNR Report); and the Agreement states that "the

substantive law of the state [of Maryland] shall apply" in the event that the signor files a

lawsuit against UTB, (Agmt. ¶ 6). Accordingly, the Court analyzes all of the claims in this

matter under Maryland substantive law in the absence of an applicable rule of maritime

law.

With regard to exculpatory clauses, both maritime law and Maryland law permit

their enforcement as a general matter. Though the Limitation Act bars enforcement of

exculpatory clauses, this prohibition extends only to common carriers and "has no

application where the defendant is not acting as a common carrier." Waggoner, 141 F.3d

at *5–6. Providers of recreational services "are not embraced within [this] duty as a

common carrier although their performance may incidentally involve the actual

transportation of persons and things." Santa Fe, Prescott & Phx. Ry. Co. v. Grant Bros.

Constr. Co., 228 U.S. 177, 185 (1913). Where the party opposing liability is not a common

carrier, maritime law permits the enforcement of exculpatory clauses. See Waggoner, 141

F.3d at *6; Kerr-McGee Corp. v. L., 479 F.2d 61, 64 (4th Cir. 1973) (noting that parties to

a private contract for affreightment were "free to make whatever contractual allocation of

risk they desired"). Similarly, under Maryland law, "in the absence of legislation to the

16

contrary, a public policy in favor of freedom of contract generally supports the validity of exculpatory clauses." Nerenhausen v. Washco Mgmt. Corp., No. JKB-15-1313, 2017 WL 1398267, at *3 (D.Md. Apr. 18, 2017).

The same is true for indemnity clauses. Express agreements for indemnification are enforceable under maritime law. See generally Becker v. Tidewater, Inc., 586 F.3d 358 (5th Cir. 2009) (enforcing indemnity provisions in a contract subject to maritime law); In re Aramark Sports & Ent. Servs., LLC, No. TC-09-637, 2012 WL 3776859 (D.Utah Aug. 29, 2012). Express indemnity agreements are also enforceable under Maryland law. Nat'l Lab. Coll., Inc. v. Hillier Grp. Architecture N.J., Inc., 739 F.Supp.2d 821, 828 (D.Md. 2010); Pulte Home Corp. v. Parex, Inc., 942 A.2d 722, 730 (Md. 2008).

Thus, because Maryland state law comports with the principles recognized in maritime law, state law may be used to interpret the Agreement. See Waggoner, 141 F.3d at *6–7 (analyzing the validity of an exculpatory clause in a contract for recreational maritime services under state law).

### a. Exculpatory Clause

Claimants seek to avoid the exculpatory provision in the Agreement on two grounds: (1) there was no "meeting of the minds" and therefore no valid contract; and (2) UTB engaged in grossly negligent conduct which renders the clause unenforceable. (See Claimants' Mot. at 16–18; Claimants' Reply at 5). Claimants are unable to meet their burden for either ground.

While it is true that a meeting of the minds is an essential element in contract formation, Maryland law adheres to the objective theory of contract interpretation. See

United States v. Hartford Accident & Indem. Co., 168 F.Supp.3d 824, 834–35 (D.Md. 2016). Thus, a "meeting of the minds" exists where there is "a manifestation of agreement or mutual assent by the parties to the terms thereof." Id. "As long as a contract's terms are unambiguous, a litigant's ex post account of its subjective intentions is irrelevant." Id. (emphasis in original). Here, Claimants do not attempt to argue that the language of the Agreement is ambiguous, nor do they dispute the meaning of any of its terms. Rather, Claimants contend that they cannot be bound to the exculpatory clause "[w]ithout even knowing what they were renting." (Claimants' Mot. at 17). Just as in Hartford Accident, Claimants "invite[] the Court to undertake precisely the kind of ex post subjective inquiry that is incompatible with objective contract interpretation."[6] Hartford Accident, 168 F.Supp.3d at 835 (emphasis in original). The Court declines to do so.

As a general matter, Maryland law permits exculpatory clauses to be enforced provided that they are unambiguous and understandable and "clearly and specifically

---

[6] Even if the Court were permitted to engage in a subjective inquiry, Claimants' conduct after signing the Agreement disaffirms their contention that they would not have rented the Vessel if they had known of its condition. Indeed, Claimants state that when they initially boarded the Vessel "they immediately felt overcrowded," which prompted Christina Dorris to inquire about the fitness of the Vessel, and that the Vessel "quickly began to dive and drive deep into the water." (Claimants' Mot. at 3–4). Yet, Claimants proceeded on their voyage. Claimants now express frustration that they were required to sign the Agreement prior to proceeding to the Vessel, because it was their understanding that "they wouldn't have their tour without signing paperwork." (Id. at 17). But this also belies the present assertion. Claimants acknowledge that they wanted to rent a vessel from UTB, that they understood they had to sign the Agreement in order to do so, and that they thereafter signed the Agreement. At any time prior to leaving the dock, Claimants could have objected to the Vessel and chosen not to board it, or to return to the dock when they realized the Vessel was overloaded. They did not do so. Given this series of events, Claimants cannot contend that there was no meeting of the minds between themselves and UTB when they signed the Agreement.

indicate[] the intent to release . . . liability for personal injury caused by the [other party's] negligence." Nerenhausen, 2017 WL 1398267, at *3–4. Here, the Agreement is clear and specific as to the release of claims for negligence. In fact, Claimants do not make any assertion to the contrary. The Agreement states that the signor releases all claims "**including any such claims which allege negligent acts or omissions**" of UTB and continues to state that the signor "**may be found by a court of law to have waived [the] right to maintain a lawsuit against [UTB] on the basis of any claim from which I have released herein**." (UTB Mot. at 7) (emphasis in original). These statements are bolded in the Agreement, which is otherwise written in non-bolded text. It is therefore apparent both that the language was specific as to UTB's negligence and that the clause was conspicuous.

Claimants also contend that the exculpatory clause should be rendered unenforceable because UTB exhibited gross negligence when it overloaded the Vessel. (Claimants' Mot. at 17). Courts applying Maryland law will not enforce a provision waiving claims for negligence where the party shielded by the clause engaged in reckless, wanton, or grossly negligent conduct. Wolf v. Ford, 644 A.2d 522, 525–26 (Md. 1994). Maryland law defines gross negligence "as something <u>more</u> than simple negligence." Barbre v. Pope, 935 A.2d 699, 717 (Md. 2007) (quoting Taylor v. Harford Cnty. Dep't of Soc. Servs., 862 A.2d 1026, 1035 (Md. 2004)) (emphasis in original).[7] As discussed at length above, Claimants cannot satisfy the more relaxed standard to establish simple

---

[7] The Fourth Circuit has also noted that gross negligence is a "failure to use even a slight degree of care." Hurd v. United States, 34 F.App'x 77, 84 (4th Cir. 2002).

negligence. They therefore cannot meet the heightened standard to establish gross negligence and are subject to the exculpatory clause, which bars the present claims.

Accordingly, the Court must deny Claimants' Cross Motion and grant UTB's Motion with regard to the enforceability of the exculpatory clause.

#### b.   Indemnity Clause

As a final matter, Claimants request that the Court render the indemnification clause in the Agreement "null and void" because it would be "a serious injustice" to enforce the clause. (Claimants' Mot. at 18). For similar reasons as above, the indemnity provision is valid and enforceable against the Adult Claimants.

In Maryland, a contract provision indemnifying a person against his own negligence is valid if "an intention to do so is express in those very words or in other unequivocal terms." Adloo v. H.T. Brown Real Estate, Inc., 686 A.2d 298, 302 (Md. 1996) (internal quotations and citations omitted). As it pertains to attorneys' fees specifically, Maryland courts require the indemnity provision to "expressly permit[] the recovery of fees incurred in prosecuting claims against the indemnitor." Nova Rsch., Inc. v. Penske Truck Leasing Co., 952 A.2d 275, 286 (Md. 2008) (internal quotation and citation omitted). Here, the Agreement states: "Should [UTB], or anyone acting on their behalf, be required to incur attorneys['] fees and costs to enforce this agreement, I agree to indemnify and hold them harmless for all such fees and costs." (UTB Mem. at 7). There is no ambiguity in this language, and pursuant to the objective theory of interpretation embraced by Maryland law, the Court must "presume that the parties meant what they expressed." Nat'l Lab. Coll.,

Inc., 739 F.Supp.2d at 828. Thus, UTB is entitled to summary judgment that the Adult Claimants are liable to indemnify UTB.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant UTB's Motion for Summary Judgment (ECF No. 66) and deny Claimants' Cross Motion for Summary Judgment (ECF No. 67).

A separate Order follows.

Entered this 16th day of February, 2023.


_____/s/_____

George L. Russell, III
United States District Judge